**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

WHAM-O HOLDING, LTD. and
INTERSPORT CORP. d/b/a WHAM-O,

        Civil Action No.: 1:21-cv-00320

    Plaintiffs,

v.

THE PARTNERSHIPS AND UNINCORPORATED
ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",

    Defendants.

## COMPLAINT

Plaintiffs, WHAM-O HOLDING, LTD. and INTERSPORT CORP. d/b/a WHAM-O ("WHAM-O" or "Plaintiffs") hereby file this Complaint against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants"), and hereby allege as follows:

### JURISDICTION AND VENUE

1.     This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051 et seq. 28 U.S.C. § 1338(a)–(b) and 28 U.S.C. § 1331. This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets consumers in the United States, including Illinois, through at least the fully interactive

commercial Internet stores operating under the Defendant store names and/or the online marketplace accounts identified in Schedule A attached hereto (collectively, the "Defendant Internet Stores"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Internet Stores through which Illinois residents can purchase products bearing counterfeit versions of WHAM-O's trademarks. Each of the Defendants has targeted sales from Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold products bearing counterfeit versions of WHAM-O's federally registered trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused WHAM-O substantial injury in the State of Illinois.

3.     This Court has personal jurisdiction over each Defendant, in that each Defendant conducts significant business in Illinois and in this Judicial District, and the acts and events giving rise to this lawsuit of which each Defendant stands accused were undertaken in Illinois and in this Judicial District.

**INTRODUCTION**

4.     This action has been filed by WHAM-O to combat online counterfeiters who trade upon WHAM-O's reputation and goodwill by selling and/or offering for sale products in connection with WHAM-O's FRISBEE trademarks, which are covered by U.S. Trademark Registration Nos. 4,046,202; 970,089 and 679,186 (collectively the FRISBEE Trademarks). The registrations are valid, subsisting, unrevoked, uncancelled, and incontestable pursuant to 15 U.S.C. § 1065. The registrations for the trademarks constitute prima facie evidence of validity and of WHAM-O's exclusive right to use the trademarks pursuant to 15 U.S.C. § 1057(b). A genuine and

authentic copy of the U.S. federal trademark registration certificates for each of the FRISBEE Trademarks are attached as **Exhibit 1**.

5.     In the past, WHAM-O was able to police its marks against identifiable infringers and counterfeiters. The rise of online retailing, coupled with the ability of e-commerce sites to hide their identities, has made it nearly impossible for policing actions to be undertaken. The company has availed itself of takedown procedures to remove infringing products, but these efforts have proved to be an unavailing game of whack-a-mole against the mass counterfeiting that is occurring over the Internet. The aggregated effect of the mass counterfeiting that is taking place has overwhelmed WHAM-O and its ability to police its rights against the hundreds of anonymous defendants which are selling illegal counterfeits at prices substantially below an original.

6.     To be able to offer the counterfeit products at a price substantially below the cost of original, while still being able to turn a profit after absorbing the cost of manufacturing, advertising and shipping requires an economy of scale only achievable through a cooperative effort throughout the supply chain. As Homeland Security's recent report confirms, counterfeiters act in concert through coordinated supply chains and distribution networks to unfairly compete with legitimate brand owners while generating huge profits for the illegal counterfeiting network:

> Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. **Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks.** The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, sellers on digital platforms have consumer visibility well beyond the seller's natural geographical sales area.
>
> . . .
>
> The impact of counterfeit and pirated goods is broader than just unfair competition. Law enforcement officials have uncovered intricate links between the sale of counterfeit goods and transnational organized crime. **A study by the Better Business Bureau notes that the financial operations supporting counterfeit goods typically require central coordination**, making these activities attractive

3

for organized crime, with groups such as the Mafia and the Japanese Yakuza heavily involved. Criminal organizations use coerced and child labor to manufacture and sell counterfeit goods. In some cases, the proceeds from counterfeit sales may be supporting terrorism and dictatorships throughout the world.

. . .

Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy.

See Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods), at 10, 19 (emphasis added) attached hereto as **Exhibit 2**.

7.   The Defendant Aliases share unique identifiers, such as design elements and similarities of the unauthorized products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants use aliases to avoid liability by going to great lengths to conceal both their identities as well as the full scope and interworking of their illegal network. Despite deterrents such as takedowns and other measures, the use of aliases enables counterfeiters to stymie authorities:

The scale of counterfeit activity online is evidenced as well by the significant efforts e-commerce platforms themselves have had to undertake. A major e-commerce platform reports that its proactive efforts prevented over 1 million suspected bad actors from publishing a single product for sale through its platform and blocked over 3 billion suspected counterfeit listings from being published to their marketplace. Despite efforts such as these, private sector actions have not been sufficient to prevent the importation and sale of a wide variety and large volume of counterfeit and pirated goods to the American public.

. . .

A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. The ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked. On these sites, online counterfeiters can misrepresent products by posting pictures of authentic goods while simultaneously selling and shipping counterfeit versions.

. . .

Not only can counterfeiters set up their virtual storefronts quickly and easily, but they can also set up new virtual storefronts when their existing storefronts are shut down by either law enforcement or through voluntary initiatives set up by other stakeholders such as market platforms, advertisers, or payment processors.

*Id.* at 5, 11, 12.

8.   eCommerce giant Alibaba has also made public its efforts to control counterfeiting on its platform.   It formed a special task force that worked in conjunction with Chinese authorities for a boots-on the ground effort in China to stamp out counterfeiters. In describing the counterfeiting networks, it uncovered, Alibaba expressed its frustration in dealing with "vendors, affiliated dealers and factories" that rely upon fictitious identities that enable counterfeiting rings to play whack-a-mole with authorities:

# Fighting China's counterfeits in the online era

Xinhua | Updated: 2017-09-19 14:20



BEIJING - A secret team in Chinese e-commerce giant Alibaba has the task of pretending to be online consumers who test-buy purchases from the billion-plus products on its platforms.

Alibaba's Anti-Counterfeiting Special Task Force, formed last year, actively works with local law enforcement agencies, said Qin Seng.

"After we clean up online shops selling counterfeits, the counterfeiters usually change their identities and places of dispatch, using more covert means to continue selling online," Qin said.

The team uses big data to identify counterfeits and the vendors, affiliated dealers and factories suspected of producing or selling counterfeit items. They pass evidence to the public security, administration of commerce and industry, quality inspection, food and drug supervision and other law enforcement agencies. At the same time, they investigate the evidence in the field.

The team faces many risks in their offline probes.

"Most counterfeiting dens are hidden and well-organized. For example, we encountered a village producing counterfeits. The villagers installed cameras everywhere and when they saw outsiders entering, they became vigilant and even threatened us," Qin said.

*See* Xinhua, *Fighting China's Counterfeits in the Online Era,* China Daily (Sept. 19, 2017), available at www.chinadaily.com.cn/business/2017-09/19/content_32200290.htm (**Exhibit 3**).

9. WHAM-O has been and continue to be irreparably damaged through consumer confusion, dilution, loss of control over its reputation and good-will as well as the quality of goods bearing the FRISBEE Trademarks. The rise of eCommerce as a method of supplying goods to the public exposes brand holders and creators that make significant investments in their products to significant harm from counterfeiters:

> Counterfeiting is no longer confined to street-corners and flea markets. The problem has intensified to staggering levels, as shown by a recent Organisation for Economic Cooperation and Development (OECD) report, which details a 154 percent increase in counterfeits traded internationally — from $200 billion in 2005 to $509 billion in 2016. Similar information collected by the U.S. Department of Homeland Security (DHS) between 2000 and 2018 shows that seizures of infringing goods at U.S. borders have increased 10-fold, from 3,244 seizures per year to 33,810.
>
> …
>
> The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. It is no longer

enough for a small business to develop a product with significant local consumer demand and then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat.

. . .

Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.

. . .

Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses.

*See Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020,

(**Exhibit 2)** at 4, 8, 11.

10.    Not only are the creators and brand holders harmed, the public is harmed as well:

The rapid growth of e-commerce has revolutionized the way goods are bought and sold, allowing for counterfeit and pirated goods to flood our borders and penetrate our communities and homes. Illicit goods trafficked to American consumers by e-commerce platforms and online third-party marketplaces threaten public health and safety, as well as national security. This illicit activity impacts American innovation and erodes the competitiveness of U.S. manufacturers and workers.
The President's historic memorandum provides a much warranted and long overdue call to action in the U.S. Government's fight against a massive form of illicit trade that is inflicting significant harm on American consumers and businesses. This illicit trade must be stopped in its tracks.

*Id.* at 3, 4. (Underlining in original).

11.    WHAM-O's investigation shows that the telltale signs of an illegal counterfeiting ring is present in the instant action. For example, Schedule A shows the use of store names by the Defendant Aliases that employ no normal business nomenclature and, instead, have the appearance

7

of being made up, or if a company that appears to be legitimate is used, online research shows that there is no known address for the company. Thus, the Defendant Aliases are using fake online storefronts designed to appear to be selling genuine WHAM-O products, while selling inferior imitations of WHAM-O's products. The Defendant Aliases also share unique identifiers, such as design elements and similarities of the counterfeit products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal counterfeiting operation. WHAM-O is forced to file this action to combat Defendants' counterfeiting of WHAM-O's registered trademarks, as well as to protect unknowing consumers from purchasing unauthorized FRISBEE products over the Internet.

12.    This Court has personal jurisdiction over each Defendant, in that each Defendant conducts significant business in Illinois and in this Judicial District, and the acts and events giving rise to this lawsuit of which each Defendant stands accused were undertaken in Illinois and in this Judicial District. In addition, each defendant has offered to sell and ship infringing products into this Judicial District.

<b>THE PLAINTIFFS</b>

13.    Wham-O Holding, Ltd., is a foreign company having its principal place of business in Hong Kong at 212-220 Lockhart Road, B2,11/F., Loyong Court Commercial Bldg., Wan Chai, Hong Kong and Plaintiff, InterSport Corp. d/b/a WHAM-O InterSport Corp. d/b/a WHAM-O acts as the Sales, Marketing, Design and Distribution arm of Wham-O products for the Americas and has a place of business at 966 Sandhill Avenue, Carson, California 90746.

14.    WHAM-O is engaged in the business of manufacturing, distributing and retailing

Brand, for over sixty years. WHAM-O or its predecessors have exclusively used these FRISBEE marks, and flying disc and other products sold under the FRISBEE marks are among the most popular ever sold, with sales in hundreds of millions of units.

15. WHAM-O's brand, symbolized by the FRISBEE Trademarks, is a recognized symbol of high-quality merchandise. The FRISBEE Trademarks are distinctive and identify the merchandise as goods from WHAM-O. The registrations for the FRISBEE Trademarks constitute prima facie evidence of their validity and of WHAM-O's exclusive right to use the FRISBEE Trademarks pursuant to 15 U.S.C. § 1057 (b).

16. The FRISBEE Trademarks have been continuously used and never abandoned.

17. WHAM-O has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the FRISBEE Trademarks. As a result, products bearing the FRISBEE Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being products sourced from WHAM-O.

**THE DEFENDANTS**

18. Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within Illinois and in this Judicial District, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Internet Stores. Each Defendant targets the United States, including Illinois, and has offered to sell and, on information and belief, has sold and continues to sell counterfeit FRISBEE products to consumers within the United States, including Illinois and in this Judicial District.

## THE DEFENDANTS' UNLAWFUL CONDUCT

19.     The success of the FRISBEE brand has resulted in its significant counterfeiting. Defendants conduct their illegal operations through fully interactive commercial websites hosted on various e-commerce sites, such as eBay, Wish, Alibaba, Ali Express, Tophatter, DHGate, etc. ("Infringing Websites" or "Infringing Webstores"). Each Defendant targets consumers in the United States, including the State of Illinois, and has offered to sell and, on information and belief, has sold and continues to sell counterfeit products that violate WHAM-O's intellectual property rights ("counterfeit products") to consumers within the United States, including the State of Illinois.

20.     The Defendant Aliases intentionally conceal their identities and the full scope of their counterfeiting operations in an effort to deter WHAM-O from learning Defendants' true identities and the exact interworking of Defendants' illegal counterfeiting operations. Through their operation of the Infringing Webstores, Defendants are directly and personally contributing to, inducing and engaging in the sale of counterfeit products as alleged, often times as partners, co-conspirators and/or suppliers. Upon information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell counterfeit products.

21.     Upon information and belief, at all times relevant hereto, the Defendants in this action have had full knowledge of WHAM-O's ownership of the FRISBEE Trademarks, including the exclusive right to use and license such intellectual property and the goodwill associated therewith.

22.     Defendants often go to great lengths to conceal their identities by often using multiple fictitious names and addresses to register and operate their massive network of Defendant Aliases. Other Defendant Internet Stores often use privacy services that conceal the owners' identity and contact information. Upon information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in

10

Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their massive counterfeiting operation, and to avoid being shut down.

23.     The counterfeit FRISBEE products for sale in the Defendant Aliases bear similarities and indicia of being related to one another, suggesting that the counterfeit FRISBEE products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated. The Defendant Aliases also include other notable common features, including use of the same domain name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics, HTML user-defined variables, domain redirection, lack of contact information, identically or similarly priced items and volume sales discounts, similar hosting services, similar name servers, and the use of the same text and images.

24.     In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts. For example, counterfeiters like Defendants will often register new stores or online marketplace accounts under new aliases once they receive notice of a lawsuit. Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring takedown demands sent by brand owners. Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection. A 2012 U.S. Customs and Border Protection report on seizure statistics indicated that the Internet has fueled

"explosive growth" in the number of small packages of counterfeit goods shipped through the mail and express carriers.

25.     Further, counterfeiters such as Defendants, typically operate multiple credit card merchant accounts and third-party accounts, such as PayPal, Inc. ("PayPal") accounts, behind layers of payment gateways so that they can continue operation in spite of WHAM-O's enforcement efforts. Upon information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that offshore counterfeiters regularly move funds from U.S.-based PayPal accounts to China-based bank accounts outside the jurisdiction of this Court.

26.     Upon information and belief, Defendants also deceive unknowing consumers by using the FRISBEE Trademarks without authorization within the content, text, and/or meta tags of their websites to attract various search engines crawling the Internet looking for websites relevant to consumer searches for FRISBEE products. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendant Aliases listings show up at or near the top of relevant search results and misdirect consumers searching for genuine FRISBEE products. Further, Defendants utilize similar illegitimate SEO tactics to propel new Defendant Internet Stores to the top of search results after others are shut down.

27.      Defendants' use of the trademarks on or in connection with the advertising, marketing, distribution, offering for sale and sale of the counterfeit products is likely to cause and has caused confusion, mistake and deception by and among consumers and is irreparably harming

WHAM-O. Defendants have manufactured, imported, distributed, offered for sale and sold counterfeit products using the FRISBEE Trademarks and continue to do so.

28.     Defendants, without authorization or license from WHAM-O, knowingly and willfully used and continue to use the FRISBEE Trademarks in connection with the advertisement, offer for sale and sale of the counterfeit products, through, inter alia, the Internet. The counterfeit products are not genuine FRISBEE products. WHAM-O did not manufacture, inspect or package the counterfeit products and did not approve the counterfeit products for sale or distribution. The Defendant Aliases offer shipping to the United States, including Illinois, and, on information and belief, each Defendant has sold counterfeit products into the United States, including Illinois.

29.     Defendants also deceive unknowing consumers by using the FRISBEE trademarks without authorization within the content, text, and/or meta tags of the listings on Infringing Webstores in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for FRISBEE products and in consumer product searches within the Webstores.

30.     Upon information and belief, Defendants will continue to register or acquire listings for the purpose of selling Counterfeit Goods that infringe upon the FRISBEE Trademarks unless preliminarily and permanently enjoined.

31.     Defendants' use of the FRISBEE Trademarks in connection with the advertising, distribution, offering for sale, and sale of counterfeit FRISBEE products, including the sale of counterfeit FRISBEE products into Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming WHAM-O.

**COUNT I**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)**

32.  WHAM-O repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

33.   This is a trademark infringement action against Defendants based on them unauthorized use in commerce of counterfeit imitations of the registered FRISBEE Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. The FRISBEE Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from WHAM-O's products provided under the FRISBEE Trademarks .

34.   Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products in connection with the FRISBEE Trademarks without WHAM-O's permission.

35.   The United States Registrations for the FRISBEE Trademarks (**Exhibit 1**) are in full force and effect and are exclusively owned Upon information and belief, Defendants have knowledge of WHAM-O's' rights in the FRISBEE Trademarks, and are willfully infringing and intentionally using counterfeits of the FRISBEE Trademarks. Defendants' willful, intentional and unauthorized use of the FRISBEE Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the counterfeit goods among the general public.

36.   Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

37.  WHAM-O has no adequate remedy at law, and if Defendants' actions are not enjoined, WHAM-O will continue to suffer irreparable harm to its reputation and the goodwill of its well-known FRISBEE Trademarks .

38.   The injuries and damages sustained by WHAM-O has been directly and

14

proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of counterfeit FRISBEE products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

39.     WHAM-O repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

40.     Defendants' promotion, marketing, offering for sale, and sale of counterfeit FRISBEE products have created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with WHAM-O or the origin, sponsorship, or approval of Defendants' counterfeit FRISBEE products by WHAM-O.

41.     By using the FRISBEE Trademarks in connection with the sale of counterfeit FRISBEE products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the counterfeit FRISBEE products.

42.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the counterfeit FRISBEE products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

43.     WHAM-O has no adequate remedy at law and, if Defendants' actions are not enjoined, WHAM-O will continue to suffer irreparable harm to its reputation and the goodwill of the well-known FRISBEE Trademarks.

## COUNT III
## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
## (815 ILCS § 510, et seq.)

44.     WHAM-O repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

45.     Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their counterfeit FRISBEE products as those of WHAM-O, causing a likelihood of confusion and/or misunderstanding as to the source of their goods, causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with genuine FRISBEE products, representing that their products have WHAM-O's approval when they do not, and engaging in other conduct which creates a likelihood of confusion or misunderstanding among the public.

46.     The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

47.      WHAM-O has no adequate remedy at law, and Defendants' conduct has caused WHAM-O to suffer damage to its reputation and goodwill. Unless enjoined by the Court, WHAM-O will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

## COUNT IV
## CIVIL CONSPIRACY

48.     WHAM-O repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

49.     WHAM-O is informed and believe and thereon allege that Defendants knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct including, without limitation, engaging in a collaborated effort to the distribution, marketing, advertising, shipping, offering for sale, or sale of fake FRISBEE products are a violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

50.     The intent, purpose and objective of the conspiracy and the underlying combination of unlawful acts and misconduct committed by the Defendants was to undermine WHAM-O and its business by unfairly competing against it as described above.

51.     The Defendants each understood and accepted the foregoing scheme and agreed to do their respective part, to further accomplish the foregoing intent, purpose and objective. Thus, by entering into the conspiracy, each Defendant has deliberately, willfully and maliciously permitted, encouraged, and/or induced all of the foregoing unlawful acts and misconduct.

52.     As a direct and proximate cause of the unlawful acts and misconduct undertaken by each Defendant in furtherance of the conspiracy, WHAM-O has sustained, and unless each Defendant is restrained and enjoined, will continue to sustain severe, immediate and irreparable harm, damage and injury for which WHAM-O has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, WHAM-O prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily preliminarily, and permanently enjoined and restrained from:

a.   using the FRISBEE Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine FRISBEE product or is not authorized by WHAM-O to be sold in connection with the FRISBEE Trademarks ;

b.   passing off, inducing, or enabling others to sell or pass off any product as a genuine FRISBEE product or any other product produced by WHAM-O that is not WHAM-O's or not produced under the authorization, control, or supervision of WHAM-O and approved by WHAM-O for sale under the FRISBEE Trademarks ;

17

c.  committing any acts calculated to cause consumers to believe that Defendants'
counterfeit FRISBEE products are those sold under the authorization, control, or
supervision of WHAM-O, or are sponsored by, approved by, or otherwise connected
with WHAM-O;

d.  further infringing the FRISBEE Trademarks and damaging WHAM-O's goodwill;

e.  otherwise competing unfairly with WHAM-O in any manner;

f.  shipping, delivering, holding for sale, transferring or otherwise moving, storing,
distributing, returning, or otherwise disposing of, in any manner, products or inventory
not manufactured by or for WHAM-O, nor authorized by WHAM-O to be sold or
offered for sale, and which bear any WHAM-O's trademarks, including the FRISBEE
Trademarks, or any reproductions, counterfeit copies, or colorable imitations thereof;

g.  using, linking to, transferring, selling, exercising control over, or otherwise owning the
online marketplace accounts, the Defendant Internet Stores, or any other internet store
or online marketplace account that is being used to sell or is the means by which
Defendants could continue to sell counterfeit FRISBEE products; and

h.  operating and/or hosting websites at the Defendant Internet Stores and any other names
registered or operated by Defendants that are involved with the distribution, marketing,
advertising, offering for sale, or sale of any product bearing the FRISBEE Trademarks or
any reproduction, counterfeit copy or colorable imitation thereof that is not a genuine
FRISBEE product or not authorized by WHAM-O to be sold in connection with the
FRISBEE Trademarks; and

2)  That Defendants, within fourteen (14) days after service of judgment with notice of entry
thereof upon them, be required to file with the Court and serve upon WHAM-O a written report under

oath setting forth in detail the manner and form in which Defendants have complied with paragraph 1, a through h, above;

    3) Entry of an Order that, upon WHAM-O's request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces such as, but not limited to, Amazon, ContextLogic, Tophatter, DHGate, and Alibaba Group Holding Ltd., Co., Ltd. and any related Alibaba entities (collectively, "Alibaba"), social media platforms, Facebook, YouTube, LinkedIn, Twitter, Internet search engines such as Google, Bing and Yahoo, web hosts for the Defendant Internet Stores, and domain name registrars, shall:Alipay.com Co., Ltd. and any related Alibaba entities (collectively, "Alibaba"), social media platforms, Facebook, YouTube, LinkedIn, Twitter, Internet search engines such as Google, Bing and Yahoo, web hosts for the Defendant Internet Stores, and domain name registrars, shall:

    a.  disable and cease providing services for any accounts through which Defendants engage in the sale of counterfeit FRISBEE products using the FRISBEE Trademarks, including any accounts associated with the Defendants listed on Schedule A;

    b.  disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit FRISBEE products using the FRISBEE Trademarks; and

    c.  take all steps necessary to prevent links to the Defendant Internet Stores identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Internet Stores from any search index; and

    5) That Defendants account for and pay to WHAM-O all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for

infringement of the FRISBEE Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

      6)  In the alternative, that WHAM-O be awarded statutory damages pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the FRISBEE Trademarks;

      7)  That WHAM-O be awarded its reasonable attorneys' fees and costs; and

      8)  Award any and all other relief that this Court deems just and proper.

DATED: January 20, 2021                 Respectfully submitted,

*/s/ Keith A. Vogt*
Keith A. Vogt (Bar No. 6207971)
Keith Vogt, Ltd.
111 West Jackson Boulevard, Suite 1700
Chicago, Illinois 60604
Telephone: 312-675-6079
E-mail: keith@vogtip.com

***ATTORNEY FOR PLAINTIFFS***